### Boston & Maine Railroad *v.* Suncook Valley Railroad.

*Sulloway, Piper, Jones, Hollis & Godfrey (Mr. Piper* orally), for the plaintiff.

*Morse & Grant (Mr. Grant* orally), for the defendant.

JOHNSTON, J. Before proceeding to a construction of the portion of the lease relied upon by the Suncook, it is well to recount the circumstances under which the Maine used the 300 feet of the northerly end of the loop in serving the exchange beginning in December, 1941.

In the said lease the Maine covenanted and agreed, "that the Suncook . . . shall and may peaceably and quietly have, hold and enjoy the said demised premises for and during the term aforesaid, without let, interruption, hindrance or molestation on the part of the Maine. . . . " After the desires of the exchange became known, the Maine sought a modification of the lease to the Suncook; that is, a release of the northernmost 550 feet of the track. It submitted to the latter a proposed draft of the modification. On December 18, 1940 the Executive Committee of the Board of Directors of the Suncook decided that it was agreeable to the proposed amendment provided that its trains should have priority over the trackage to be released. The Maine agreed to this priority. May 15, 1941 the Directors of the Suncook ratified the action of the Executive Committee. November

19, 1941, President Colbath, without being specifically authorized, executed the release of the 550 feet for the Suncook; and December 16, 1941, President French with due authority signed for the Maine. The Trial Judge found that May 21, 1942, the Board of Directors of the Suncook ratified the execution of the amending indenture by President Colbath. The Court said: "The legal effect, however, is the same as though a ratification vote had been passed. The intention is clear. The Board of Directors, even though slight consideration was given to the matter, intended to give authority to the President to execute the agreement effective November, 1941. The fact that he had already executed the instrument changes the character of the vote to one of ratification or affirmance. Nothing would be gained by requiring President Colbath to repeat what he had already done."

The Court found that the defendant acquiesced in and assented to the use of the portion by the Maine that the amendment purported to release.

There has been much discussion by both parties concerning the execution of the release, the matter of consideration, the need of approval by the Interstate Commerce Commission or the New Hampshire Public Service Commission and, if such is needed, the effect of the absence of it. In the present proceeding, however, the Maine does not have to justify its receipt of freight revenues from the exchange business. It is asking for no relief from the courts under the modifying indenture. The Suncook must depend upon the strength of its claim. Since this is what it alleges, it must establish under the quoted clause of the lease its legal right to the revenues paid to the Maine for the freight of the exchange hauled over a part of the 550 feet of the loop that was purportedly released.

A lease should always be construed so as to give effect to the intent of the parties. To this end it should be considered "as a connected whole." *Machinist* v. *Koorkanian*, 82 N. H. 249, 252. The effect of the agreement of May 25, 1936 was to lease and demise to the Suncook the Suncook loop. Thereafter for the term thereof the Maine had no right to operate trains on this stretch of the track. That right was solely in the Suncook. The covenant for peaceable and quiet enjoyment of the loop on the part of the Suncook without interruption on the part of the Maine has already been quoted. The lease further provided: "The Suncook will at all times while these presents are effective operate the aforesaid premises in all respects as required by law, . . . "

When the document refers to "tolls and revenues . . . in connection with the operation of said line of railroad," it means operation of the railroad by the Suncook, because the instrument recognized this right in no one else. It means the division of revenues received by the Maine but earned by the Suncook through its operation of the loop or portions thereof. To quote from the second supplemental brief of the Suncook, "Of course all regulatory bodies recognize that freight consigned in the midwest, for example, to the Merrimack Farmers Exchange at Bow Junction results in each carrier's participating in the haul receiving an appropriate portion of the total freight paid." This appropriate portion of the freight paid is what is known in railroad language as a "division." A carrier is not entitled to a division unless it earns it by transporting the freight over its tracks. "The carrier is not entitled to scheduled charges for which it has rendered no services or benefits." 13 C. J. S. 723, and cases cited under note 81. The part of the lease of 1936 under which the Suncook seeks recovery meant divisions received by the Maine but earned by the Suncook by operation of its trains over the tracks demised. It did not contemplate such an extraordinary situation as the facts of this case present; namely, payments for freight received by the lessor by reason of its operation of trains over the said tracks demised. The lease reserved no trackage rights to the lessor. "We believe that the covenant under consideration was not intended to apply to such an extraordinary situation as that here disclosed." *Nashua &c. Paper Co.* v. *Noyes &c. Co.*, 93 N. H. 348, 351. See also, *Phinney* v. *Foster*, 189 Mass. 182.

The revenues derived from the exchange now sought by the defendant were earned by the Maine. Its locomotives and cars did the hauling; its coal furnished the power; and its employees did the work. According to the Trial Judge, the Suncook acquiesced and assented. The lease of 1936 in nowise foresaw such a situation as this. Under its terms the Maine had no right to operate on the loop. If the lease did not provide for such earnings, they do not come within the wording relied upon and cannot be recovered by the defendant.

Accordingly it becomes unnecessary in this action to determine the validity of the modifying agreement.

The defendant excepted to the finding that the Merrimack Farmers Exchange, Inc. would not have accepted the defendant's services. In support of this the Court found upon sufficient evidence that the Suncook was in serious financial difficulties, that its service was inadequate and unreliable, that its total rail equipment consisted of one engine and one passenger car. Mr. Ralph E. Parmenter, general

manager of the exchange in 1940 and 1941, testified that the Suncook was "in no position to perform the service we needed and wanted and Mr. Fowler at that time admitted it." He also said that we told Mr. Fowler and Mr. Whittemore, "that we would never build a mill on the Suncook Valley Railroad." It could be found that as general manager he had sufficient knowledge and authority to make such a statement; and the evidence of the statement was competent both upon the good faith of the plaintiff and on the issue of whether the Suncook was entitled to the divisions of freight charges.

Another of the defendant's exceptions was taken to the finding that it acquiesced in and assented to the services rendered by the plaintiff to the exchange. This finding is not now used for the purpose of establishing a valid modification of the lease. Insofar as it indicates no protest against the open and public actions of the plaintiff, it is substantiated by the negotiations concerning the lease amendment, the absence of any evidence of warnings or protests against the conduct of the Maine and the failure to make any claim for the divisions until March, 1945. This finding also served to establish the plaintiff's good faith.

There was substantial evidence to establish the other findings of the Court.

*Judgment for the plaintiff on the plea of set-off as well as on its own claim.*

MARBLE, C. J., took no part in the decision: the others concurred.